IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-00302-JLK

CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER,

    Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,

    Defendants.

___

**ORDER AWARDING ATTORNEY FEES**
___

Kane, J.

    Plaintiff Civil Rights Education and Enforcement Center ("CREEC") asserted claims in this case under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against Defendants The U.S. Department of Homeland Security and U.S. Immigration and Customs Enforcement ("ICE"). Presently before me is Plaintiff's Motion for Award of Attorney Fees and Costs (ECF No. 80), in which Plaintiff requests an award of $243,285. FOIA authorizes the court to "assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under [the statute] in which the complainant has substantially prevailed." *Id.* § 552(a)(4)(E)(i). Defendants do not dispute that Plaintiff "is entitled to some amount of attorney fees pursuant to 5 U.S.C. § 552(4)(E)(i)." Response at 1, ECF No. 85. However, Defendants contend the amount requested is "well beyond what could be considered reasonable." *Id.* They suggest that no more than $85,086 should be permitted. *Id.* at 21. I consider each of Defendants' challenges to Plaintiff's request and find that an award of $201,088.75 is appropriate.

1

## I. Background

Plaintiff is a non-profit whose "mission is to provide education and advocacy, including litigation, to ensure that everyone can fully and independently participate in our nation's civic life without discrimination based on race, gender, disability, religion, national origin, age, sexual orientation, or gender identity." Fox Decl. ¶ 3, ECF No. 80-13. In furtherance of that mission, Plaintiff formed its Immigration Detention Accountability Project in 2018 to formalize its work advocating for people in ICE custody to "receive adequate medical care, mental health care, and accommodations for disabilities." *Id. ¶* 4.

During the second half of 2017 and the first half of 2018, Plaintiff submitted multiple FOIA requests to ICE seeking records on the conditions of confinement for individuals in ICE detention. Fox Decl. ¶ 6; First Am. Compl. ¶¶ 22, 29-31, 45, 59, 71, 77, 83, ECF No. 19. Plaintiff was "investigating conditions of confinement of immigrants (and in particular as they affect persons with disabilities or who are medically vulnerable)." Stipulation for Conclusion of Matter ¶ 1, ECF No. 73. After ICE did not respond to Plaintiff's FOIA requests, Plaintiff filed this suit seeking to compel Defendants to make the related records available to it.

Judge Matsch originally presided over this case and held five discovery-related Scheduling and Status Conferences before his passing in May 2019. *See* 8/15/2018 Minutes, ECF No. 26; 9/25/2018 Minutes, ECF No. 34; 10/26/2018 Minutes, ECF No. 36; 12/7/2018 Minutes, ECF No. 37; 2/15/2019 Minutes, ECF No. 47. At the last Conference he held, after working for months to move document production along, he aptly described this case, stating:

> The whole idea is [to] shine a light on these things, see what is going on, and consider that the people who are in [the detention facilities] are vulnerable because of their status. . . . This is . . . an exercise in humanity, as I see it. So that is what we have to be concerned about: these are people, and they are vulnerable.

2/15/19 Conference Hr'g Recording.

2

Defendants explain that ICE's standard procedure for responding to FOIA requests is to first "task the applicable ICE sub-units to search for potentially responsive records (in any form), then [to] gather those records in a single FOIA office, where the records are processed and released as appropriate." Resp. at 3 n.1. In the submitted Scheduling Order in this case, Defendants reported that ICE had identified approximately 58,000 pages of records that were potentially responsive to Plaintiff's requests. Scheduling Order at 4, 7, ECF No. 35.

According to Defendants, once ICE completes its search for potentially responsive records, the set of documents identified undergoes a line-by-line review to determine whether redactions are necessary for a record to be released. *See* Resp. to Mot. for Sanctions at 2, ECF No. 54. Defendants claimed that, due to resource limitations, ICE could only review and produce 500 pages of requested documents per month. In support of this claim, Defendants filed a declaration from Catrina Pavlik-Keenan, the Director of the ICE FOIA Office. *See* Pavlik Decl., ECF No. 25. Ms. Pavlik-Keenan declares that, "[i]n order to meet its obligations for all cases in litigation, and ensure that all of the FOIA matters progress so that each requester can receive responses, the ICE FOIA Office typically cannot process more than 500 pages per month for each case." *Id.* ¶ 15. Plaintiff filed a six-page response to Ms. Pavlik-Keenan's Declaration, arguing that the increase in FOIA requests experienced by ICE was predictable and yet Defendants failed to take any steps to increase ICE's resources or staff. Resp. to Decl. at 4, ECF No. 30.

Due to its limited capacity, Defendants suggested that Plaintiff propose additional search terms so that the data set of 58,000 documents could be narrowed. Plaintiff agreed to do so but urged the Court to impose deadlines on Defendants for certain categories of records. In issuing the Scheduling Order, Judge Matsch did not specifically require Defendants to produce an excess

3

of 500 pages per month. Instead, he directed the parties to proceed with Plaintiff's narrowed and prioritized requests. Scheduling Order at 5-6.

At the Status Conference on December 7, 2018, Judge Matsch ordered the parties to confer and submit a schedule for production of the remaining documents responsive to Plaintiff's requests. 12/7/18 Minutes at 1. The parties submitted a "Proposed Production Schedule," providing only a framework for production of the documents and no mutually agreed upon deadlines. Proposed Production Schedule at 1, 7, ECF No. 46. Defendants explained that the review process necessarily required them to search the 58,000 potentially responsive documents for terms related to Plaintiff's requests. *Id.* at 3. But Plaintiff pressed the Court to consider whether many of the documents sought could be produced without employing the search-term process. *Id.* at 5 (asserting that many of the documents "may be much more efficiently located by simple inquiry to the facility involved, e.g., 'what policies and procedures are available to you to inform matters involving[] detainees with disabilities?'").

During the Status Conference held on February 15, 2019, Judge Matsch ascertained that Plaintiff's three priority requests were (1) the December 15, 2016, ICE Directive titled "Assessment and Accommodations for Detainees with Disabilities," (2) ICE's policies and procedures that apply to detainees with disabilities, and (3) the Detainee Death Reviews from three ICE facilities. *See* 2/15/19 Minutes at 2. He then ordered Defendants to produce those three categories of documents within 60 days or to explain why they were unable to do so. *Id.*

Three months later, in May 2019, Plaintiff filed a Motion for Sanctions and Order to Produce Documents (ECF No. 51) regarding two specific Detainee Death Reviews—those for Vincente Caceres Maradiaga and Kamyar Samimi. According to that Motion:

> ICE ha[d] been well aware of both death investigation files for the entire pendency of this action but pretended they did not exist. ICE put the Plaintiff through

4

> meaningless and time-consuming word-search exercises in a futile effort to find the Death Reviews in a 60,000-page data set . . . which ICE well knew did not contain them. All the while ICE was fully aware of the existence, contents, and whereabouts of the two Detainee Death Reviews.

Mot. for Sanctions at 5, ECF No. 51. Defendants' Response to the Motion for Sanctions did not deny that ICE had known about the existence, contents, and whereabouts of the two Detainee Death Reviews and yet had not produced them or claimed an exemption. Although other Detainee Death Reviews were included in the 58,000 pages of documents identified as potentially responsive, the Maradiaga and Samimi Reviews were not, purportedly because they were incomplete. Plaintiff worked with ICE to develop refined search terms to locate those specific Reviews in the data set, while ICE knew that the data set did not contain them. *See* February/March 2019 Counsel Emails, ECF No. 51-2 at 5, 6. Plaintiff was not made aware of the fact that "incomplete" records would not appear in the set of 58,000 documents until March 2019, when ICE's counsel emailed:

> [T]o the extent that these investigations were still open at the time of the search, those documents would have been withheld as a part of an open and pending investigation. . . . It could be that the investigations are now closed and so documents can be released, but that would be beyond the scope of the requests in this matter.

March/April 2019 Counsel Emails, ECF No. 51-3 at 3. Plaintiff summed up Defendants' problematic conduct in its Reply in Support of its Motion for Sanctions: "ICE, through word games and subterfuge, and in clear defiance of Judge Match's [sic] February 15 Order . . ., played a 'shell game' to avoid producing the documents or explaining why [it did] not as required by Judge Matsch and FOIA." *See* Reply to Mot. for Sanctions at 10, ECF No. 58. Still, Defendants claimed that ICE had made "good-faith, collaborative, and responsive efforts" by working with Plaintiff to produce 3,000 pages of other documents and committing to produce the

5

Maradiaga and Samimi Death Reviews by the end of June 2019 (over two months after the mid-April deadline given by Judge Matsch). Resp. to Mot. for Sanctions at 4-5, 17.

In July 2019, Plaintiff moved for leave to file a Second Amended Complaint. *See* Mot. for Leave, ECF No. 57. By amending the complaint, Plaintiff sought to update its request related to the Maradiaga and Samimi Detainee Death Reviews and to obtain new information on the expansion of the Aurora Detention Facility. *Id.* at 3.

Before the Motion for Sanctions and Motion for Leave were ruled on, the parties reached an agreement regarding the merits of the case. In January 2020, the parties filed their Stipulation Regarding Conclusion of Matter and Procedure for Determination of Remaining Issues and Plaintiff's Claim for Attorney Fees (ECF No. 73). Pursuant to their agreement, Defendants produced additional documents related to the expansion of the Aurora facility, and Plaintiff withdrew the pending motions.

All that remains to be resolved in this case is the award of attorney fees and costs under FOIA's fee provision. Plaintiff requests $475 in costs and $242,810 for attorney fees incurred in prosecuting this case and preparing its Motion for Fees. The fees are based on the work performed by five attorneys—Thomas Kelley, Timothy Fox, Amber Gonzales, Elizabeth Jordan, and Chad Jimenez—as well as six individuals classified as legal assistants or paralegals—Ana Diaz, Caitlin Hall, Merieme Diop, Y. Eswaran, Shelley Terrell, and Rachael Quereau.[1]

In support of its Motion for Attorney Fees, Plaintiff submits the declarations of two attorneys who worked on the case—Thomas Kelley and Timothy Fox—and the declaration of

---

[1] Plaintiff's fee expert, Michael McCarthy, does not include Y. Eswaran, Shelley Terrell, or Rachael Quereau in his list of Legal Assistants and Paralegals, but he does include Charlotte Scull. McCarthy Decl. ¶ 19, ECF No. 83-15. I have been unable to locate any billing records for Charlotte Scull, but Plaintiff's records include entries for Y. Eswaran and the records submitted for Armstrong Teasdale, LLP appear to bill time for Rachael Quereau and Shelley Terrell.

expert Michael McCarthy. Mr. Fox is Plaintiff's cofounder, Fox Decl. ¶ 8, and Mr. Kelley worked on the case as pro bono counsel, first as Senior Counsel at Ballard Spahr LLP and then as Of Counsel to Killmer, Lane & Newman. Kelley Decl. ¶ 5, ECF No. 80-1. Mr. McCarthy is a partner at the firm of Faegre Drinker Biddle & Reath LLP and was engaged by Plaintiff to provide his opinion as to the reasonableness of the fees requested by Plaintiff in this case. McCarthy Decl. ¶¶ 1, 7, ECF No. 80-15. Each declaration affirms that the requested fees are reasonable. Specifically, Mr. McCarthy opines:

> [T]he time spent and rates charged by Plaintiff's attorneys and their legal assistants, as reflected in the tabulation below, is reasonable as measured by controlling fee award standards under the facts and circumstances of this case.

| **TIMEKEEPER** | **TOTAL HOURS EXPENDED** | **VALUE OF HOURS EXPENDED** |
|---|---|---|
| Thomas B. Kelley | 286.9 @ $645/hour | $185,050.50 |
| Timothy Fox | 12.0 @ $540/hour | $6,480.00 |
| Amber Gonzales | 50.2 @ $300/hour | $15,060.00 |
| Elizabeth Jordan | 83.0 @ $355/hour | $29,465.00 |
| * * * | | |
| Chad P. Jimenez | 7.6 @ $320/hour | $2,432.00 |
| Paralegals | 24.7 @ $175/hour | $4,322.50 |
| TOTAL: | 464.4 total hours | $242,810.00 |

*Id.* ¶ 34.

## II. Analysis

As Defendants concede, Plaintiff is entitled to the reasonable attorney fees and other litigation costs it has incurred in substantially prevailing in this case. *See* 5 U.S.C. § 552(4)(E)(i).[2] To determine whether the attorney fees requested are reasonable, I must first calculate the lodestar amount, which "is the product of the number of attorney hours 'reasonably expended' and a 'reasonable hourly rate.'" *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). Plaintiff has the burden of showing that both the number of hours expended and the hourly rates are reasonable. *Id.* If Plaintiff carries that burden, "'the resulting product is presumed to be a reasonable fee.'" *Id.* (quoting *Cooper v. Utah*, 894 F.2d 1169, 1171 (10th Cir. 1990)).

### A. Reasonableness of the Hours Expended

I begin by assessing whether the number of hours for which Plaintiff requests an award of fees were reasonably expended by its counsel. The Tenth Circuit has suggested a few factors to consider in determining the reasonableness of the hours expended, including: "(1) whether the tasks being billed 'would normally be billed to a paying client,' (2) the number of hours spent on each task, (3) 'the complexity of the case,' (4) 'the number of reasonable strategies pursued,' (5) 'the responses necessitated by the maneuvering of the other side,' and (6) 'potential duplication of services' by multiple lawyers." *Robinson*, 160 F.3d at 1281 (quoting *Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983)). I approach the reasonableness inquiry and evaluation of these

---

[2]In reaching this conclusion, I have also taken into account the discretionary factors, i.e., (1) the benefit to the public derived from the case; (2) the commercial benefit to Plaintiff; (3) the nature of the Plaintiff's interest in the records sought; and (4) whether Defendants' withholding of the records had a reasonable basis in the law. *See Aviation Data Serv. v. FAA.*, 687 F.2d 1319, 1321 (10th Cir. 1982).

8

factors "much as a senior partner in a private firm would review the reports of subordinate attorneys when billing clients whose fee arrangement requires a detailed report of hours expended and work done." *Ramos*, 713 F.2d at 555. However, I "need not identify and justify every hour allowed or disallowed, as doing so would run counter to the Supreme Court's warning that a 'request for attorney's fees should not result in a second major litigation.'" *Malloy v. Monahan*, 73 F.3d 1012, 1018 (10th Cir. 1996) (quoting *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1203 (10th Cir. 1986)).

Defendants argue that the number of hours claimed by Plaintiff are unreasonable and that I should: "(1) disallow[] hours for portions of the case on which CREEC did not substantially prevail; (2) [reduce the] hours due to overstaffing, duplication of effort, and deficiencies in billing recordkeeping; (3) reduc[e] the time billed in preparing the motion for fees; and (4) excis[e] time incurred for tasks that are not compensable under FOIA." Resp. at 6-7.

*Hours Expended for Portions of the Case on Which CREEC Did Not Substantially Prevail*

Under FOIA, a party must substantially prevail to recover its fees and costs. *See* 5 U.S.C. § 552(4)(E)(i). The statute defines what it means to "substantially prevail" as obtaining relief through either "(I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." *Id.* § 552(4)(E)(ii). Defendants contend that Plaintiff seeks attorney fees for three portions of the litigation on which it did not substantially prevail, namely the filing of a response to the Pavlik-Keenan Declaration, the Motion for Sanctions, and the Motion for Leave to File a Second Amended Complaint.

9

Plaintiff's Response to the Declaration of Ms. Pavlik-Keenan argued that ICE's own failures caused the strain on its FOIA-review capacity. While Judge Matsch did not specifically require Defendants to produce more than their stated capacity, he did eventually impose a deadline for production of Plaintiff's prioritized requests. *See* 2/15/19 Minutes at 2 ("Defendants shall produce the three categories of documents in 60 days or explain why they are unable to do so."). Plaintiff asserts that its goal in responding to the Pavlik-Keenan Declaration was to convince the Court to impose such a performance-based deadline and thus that its Response was successful. I agree that Plaintiff's Response was prudent, prompted by Defendants' actions, and produced the desired result. Consequently, I do not exclude from the fee request the hours Plaintiff's counsel expended in preparing and filing that Response.

Regarding Plaintiff's Motion for Sanctions, Defendants maintain that the related work was nonproductive because the Motion was withdrawn and because it did not pertain to any of the documents that ICE ultimately produced as part of the parties' settlement. Plaintiff asserts that it withdrew the Motion in order to get immediate access to current documents. The Motion exposed Defendants to additional risk and was a bargaining chip for Plaintiff. It cannot be mere coincidence that the parties were able to settle shortly after it was filed and that one of the conditions of that settlement was that the Motion be withdrawn. I find that the hours expended on the Motion for Sanctions are compensable. The finished product submitted by Plaintiff reveals, however, that $25,000[3] for the work is excessive.[4] For that reason, I deduct $5,000 from Plaintiff's fee request.

---

[3]This approximation is taken from the spreadsheet submitted by Defendants, which separates the hours Plaintiff's counsel expended on each disputed task. Defs.' Spreadsheet at 3-5, ECF No. 85-3. I only consider the hours spent on the demand for sanctions and drafting the Motion and Reply.

[4]*See, e.g.*, Reply to Mot. for Sanctions at 12-14 (multiple omitted words and typos).

Similarly, Defendants argue Plaintiff's Motion for Leave to File a Second Amended Complaint was withdrawn and so Plaintiff could not have substantially prevailed on it. In the end, Plaintiff obtained some of the documents sought in the Second Amended Complaint via the merits settlement. Defendants argue Plaintiff "could simply have proposed the settlement in July, and avoided its attorneys spending 23.8 hours briefing a motion it subsequently abandoned." Resp. at 9-10. This argument is unfairly made with the benefit of hindsight. Plaintiff could not have anticipated Defendants' willingness to enter into a settlement after facing continuous opposition throughout this case. Indeed, the Motion documents that Defendants' counsel had indicated Defendants "oppose[d] the motion [to] amend" and specifically opposed including documents related to the April 2019 facility modification "into this already long-running litigation." Mot. for Leave to File Second Am. Compl. at 1. As with Plaintiff's Motion for Sanctions, I find its Motion for Leave was strategic and the corresponding hours were reasonably expended.

*Overstaffing*

Defendants additionally argue that the hours claimed by Plaintiff should be cut by 15% due to the overstaffing of certain tasks. As mentioned above, Plaintiff seeks fees for the work of five attorneys and six paralegals in this case. Defendants highlight that two or three attorneys attended each in-person meeting or appearance and that numerous conferences between counsel are included in the billing records. Defendants further contend that Plaintiff's in-house counsel performed work that was duplicative of lead counsel's work. Plaintiff responds to that criticism by emphasizing that the billing entries were screened by Mr. Kelley and Mr. McCarthy. And Plaintiff notes that "the time records contain no time kept by more than 1 lawyer for reading

11

incoming pleadings and emails except when a second lawyer was assigned a task related to those documents." Reply at 10, ECF No. 87.

As Defendants chronicle, a significant portion of the time expended by Plaintiff's counsel involved going back and forth between attorneys.[5] *See* Defs.' Spreadsheet at 7-8. While the billing records may not include hours for more than one lawyer reviewing incoming pleadings, they reveal that three or four attorneys billed for team calls and meetings throughout the litigation. *See, e.g.*, CREEC Billing Records at 1-5, ECF No. 80-14 (entries for 1/17/2018 meeting; 1/23/2018 call; 1/25/2018 call; 3/27/2018 call; 8/14/2018 meeting; 8/29/2018 meeting; 1/4/2019 meeting; 4/18/2019 call, documented as occurring on 4/17/2019 in other billing records; and 5/16/2019 call); Ballard Spahr Invoice at 2-4, 7-8, ECF No. 80-10 (entries for 1/17/2018 meeting, 1/23/2018 call, 1/25/2018 call, 3/27/2018 call, 7/30/2018 call, 8/14/2018 call, 8/29/2018 meeting); Killmer, Lane, & Newman Billing Record at 1-3, ECF No. 80-11 (entries for 1/4/2019 meeting, 4/17/2019 call, and 5/16/2019 call); Armstrong Teasdale Invoice at 1, ECF No. 80-12 (entries for 4/17/2019 call; and 5/16/2019 call, which seems to have been included twice). Based on the duplicated work apparent in the bills and the general overstaffing of the case, I find a 15% reduction of the total fees requested is appropriate.

*Time Billed in Preparing Motion for Attorney Fees*

Plaintiff's request for fees seeks over $20,000 for preparing and filing its Motion for Attorney Fees. Defendants insist that the hours expended by Plaintiff's counsel on the Motion are excessive. Citing *Prison Legal News v. Executive Office for U.S. Attorneys*, No. 08-cv-

---

[5]Plaintiff points out that Defendants' list of purported entries for overstaffed tasks includes all time entries for all lawyers involved and so assumes no lawyer was needed for the task. Defendants' analysis is flawed, but it does not undermine my conclusion here.

12

01055-MSK-KLM, 2010 WL 3170824 (D. Colo. Aug. 10, 2010), Defendants argue that only five hours are necessary to brief a request for attorney fees in a FOIA case. In *Prison Legal News*, the court determined the hours in plaintiff's fee request for litigating the attorney-fee issue should be reduced from 28.3 hours to five hours because (1) counsel was presumed to have kept records for its work in the ordinary course of its business and "no substantial time was needed to compile or review those records"; (2) the "legal issues associated with a request for legal fees are neither novel nor complicated"; and (3) "the relative amount of the request for the attorney fee award request [wa]s disproportionate to the entire amount of attorney fees incurred for the entire matter." *Id.* at *4. As Plaintiff correctly notes, proportionality is not a concern here. But, like the court in *Prison Legal News*, I assume that substantial time was not needed to compile the billing records, and I observe that the legal issues associated with the fee request are not complicated, especially since Plaintiff's entitlement to fees is not contested. Plaintiff justifies the hours expended by asserting that it "has not submitted additional attorney time of 12.9 hours for the final work on the original fee motion and 27.8 hours for preparation of [the] reply." Reply at 11. Defendants challenge numerous aspects of Plaintiff's fee request, making Plaintiff's extensive Reply necessary. Nevertheless, if Plaintiff had submitted the additional hours, I would not have permitted them. The 35.7 hours[6] of work by highly skilled attorneys should be sufficient to brief the attorney-fee issue in this case. Balancing the simplicity of the legal issues with the quantity of Defendants' challenges, I find the claimed hours were reasonably expended.

---

[6]These numbers are taken from the Motion for Fees section of the spreadsheet submitted by Defendants. *See* Defs.' Spreadsheet at 9-10. However, I excluded the time spent by a paralegal on the Motion.

*Tasks That Would Not Be Billed to a Client*

Defendants also contend Plaintiff's request inappropriately includes four categories of work that would not be billed to a client: (1) preparing documents that were not used, (2) completing tasks Defendants claim are secretarial in nature, (3) reviewing the materials produced in this case, and (4) conducting background FOIA research.

The bills submitted by Plaintiff include hours for its counsel's preparation of declarations that were to be submitted with the Complaint. Since no declarations were attached to the Complaint, Defendants argue Plaintiff should not be compensated for this time. The content of the drafted declarations, however, was included in the Complaint and First Amended Complaint. As Plaintiff states, "[t]he fact that this work product was not used in the exact format in which it was initially prepared is not relevant to its utility in moving the case forward." Reply at 11. Therefore, I allow Plaintiff to recover for the hours its counsel spent on the declarations.

Defendants next assert that the paralegals and legal assistants working on Plaintiff's behalf engaged in secretarial tasks, such as filing pleadings, updating court calendars, creating indices of documents, and organizing files, and that these tasks would not ordinarily be billed to a client. Plaintiff counters that the so-called secretarial tasks were not routine clerical tasks but instead included "downloading produced agency records from the difficult drop box system used by ICE, research of court files of other cases, organizing and cataloguing produced documents[,] creating tables summarizing documents produced, docketing deadlines, and creation and editing of documents." Reply at 11-12. Plaintiff also underscores that 6.4 hours of legal assistant work were excluded due to Mr. McCarthy's audit. Kelley Decl. ¶ 12 ("Ballard Spahr: . . . 1.3 LA hrs. @ \$240/hr. = \$312, 1.6 LA hrs. @ \$190/hr.= \$304, 1.0 LA hr. @ \$200/ hr. = \$200; CREEC legal: LAs 2.5 hrs. @125/hour = \$312.50."). I find that time expended by Plaintiff's paralegals

14

was for tasks that are generally compensable, but as I explain below, the rates charged for that work were excessive.

Plaintiff includes in its fee request 19.9 hours[7] that its counsel spent reviewing the documents Defendants produced pursuant to FOIA. Defendants argue that I should rule, as other courts have, that "'the cost of reviewing documents produced in response to a FOIA request is simply the price of making such a request.'" Resp. at 14 (quoting *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 825 F. Supp. 2d 226, 231 (D.D.C. 2011)). But Plaintiff is adamant that review of the produced documents "was integral to the ongoing case" and "was necessary to evaluate and challenge ICE's claims of exemption." Reply at 12. While I generally agree that parties should not be compensated for reviewing documents produced as a result of a FOIA request, if the review is necessary to proceed with the litigation, then the related fees should be compensable. In this case, Plaintiff is correct that it was required to review the produced records to determine if Defendants were complying with their commitments and Judge Matsch's directives. The hours its counsel expended in doing so are reasonable considering the volume of documents sought and the evolution of the production process.

Defendants also argue that Mr. Kelley improperly billed 7.6 hours of time to acquire basic knowledge about FOIA cases by reviewing FOIA manuals and treatises and participating in a conference call regarding "FOIA procedure in D. Colo." Resp. at 14. Plaintiff claims this was not background research but was a "focused inquiry into the legal basis for ICE's extravagant claims of entitlement to delay, for purposes of drafting the Scheduling Order and preparing for the scheduling conference and ensuing status conferences." Reply at 13. I often consult manuals and treatises and do not believe that my doing so reflects a deficiency in

---

[7]This number is taken from Defendants' spreadsheet as well. *See* Defs.' Spreadsheet at 14.

knowledge or experience. On the contrary, experience has taught me that references to such resources can be the most efficient means of tackling a question or making a point. Moreover, counsel was wise to consult with other experts on Defendants' contention that ICE could delay production of records because it was under-resourced.

In sum, I do not excise any hours from Plaintiff's fee request based on Defendants' arguments regarding tasks that purportedly would not be billed to a client. I find the hours claimed are reasonable, except that I deduct $5,000 for the excess time related to Plaintiff's Motion for Sanctions and I reduce the resulting amount by 15% for the apparent duplication of efforts by Plaintiff's counsel reflected in the bills submitted.

### B. Reasonableness of the Rates Requested

The second step in calculating the lodestar amount is ascertaining the reasonable hourly rate for the attorneys and support staff included in the fee request. A reasonable rate is "the prevailing market rate in the relevant community." *Malloy*, 73 F.3d at 1018 (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The prevailing market rate is determined based on the rates "in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* (quoting *Blum*, 465 U.S. at 895 n.11).

Again, Plaintiff requests fees for the work of six attorneys as well as paralegals and legal assistants. Plaintiff's lead counsel, Mr. Kelley, worked on this case pro bono with the assistance of two less-senior attorneys, Ms. Gonzales and Mr. Jimenez, and Plaintiff's in-house counsel, Mr. Fox and Ms. Jordan. Mr. Kelley has been practicing law since 1972 and has received a number of awards for his work representing news and entertainment media and other speakers and publishers. Kelley Decl. ¶ 3. Mr. Fox graduated from Stanford Law School in 1991 and has

16

also received numerous awards and honors for his work, in particular his dedication to protecting and extending civil rights and civil liberties. Fox Decl. ¶ 8. According to Plaintiff's expert, Mr. McCarthy, "Mr. Kelley and Mr. Fox are widely regarded as among the most experienced and skillful civil rights and constitutional law practitioners in the Denver area." McCarthy Decl. ¶ 33. Ms. Jordan is the Director of Plaintiff's Immigration Detention Accountability Project and has expertise in immigration and human rights law. Fox Decl. ¶¶ 4, 9. Ms. Gonzales and Mr. Jimenez were Associate Attorneys at Ballard Spahr with four and eight years of experience, respectively. Kelley Decl. ¶¶ 6-7.

Defendants contest the reasonableness of the rates requested for these attorneys and their support staff. Plaintiff seeks $645 per hour for Mr. Kelley, $540 per hour for Mr. Fox, $355 per hour for Ms. Jordan, $300 per hour for Ms. Gonzales, $320 per hour for Mr. Jimenez, and $175 per hour for the paralegals and legal assistants. Defendants suggest that these rates should be lowered to $500 for Mr. Kelley, $450 for Mr. Fox, $300 for Ms. Jordan, $250 for Ms. Gonzales and Mr. Jimenez, and $125 for paralegals and legal assistants.

Defendants contend Mr. McCarthy's opinion that the rates claimed by Plaintiff are reasonable is flawed since he does not conclude that the sought rates are the prevailing community rate for the type of work performed. It is true Mr. McCarthy does not specifically state that he considered the type of work performed in this case. However, he discusses the rates for attorneys in the Denver market who have various levels of experience, including experience comparable or equivalent to that of Plaintiff's attorneys. *See* McCarthy Decl. ¶ 21 ("[B]illing rates charged for partners practicing in the Denver and Boulder Offices of my firm during the 2017-2019 time period with levels of experience comparable to Mr. Kelley ranged from $875 - $960; and those with levels of experience comparable to Mr. Fox ranged from $660 - $730."); *id.*

17

¶ 22 ("Billing rate surveys and studies that I considered with respect to the Denver market for the relevant time period showed billing rates for lawyers with experience equivalent to Mr. Kelley and Mr. Fox that were generally comparable to the rates for those lawyers that are included in the fee award motion in this case."). There is no reason to believe that the type of work performed in this case would command much lower rates than the ranges Mr. McCarthy references.

To support reducing the rates, Defendants cite other cases in which lower rates were permitted. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 703 F. Supp. 2d 1243, 1249-50 (D. Colo. 2010) (awarding $400 per hour in 2010 for counsel in Denver with 17 years of experience); *Prison Legal News*, 2010 WL 3170824, at *3 (accepting a rate of $315-320 per hour for a partner in Denver in 2010); *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, No. 15-cv-00127-WJM-CBS, 2017 WL 7360420, at *3 (D. Colo. Nov. 21, 2017) (permitting $500 per hour for an attorney with 21 years of experience based in Durango, Colorado). However, these cases do not establish that the rates sought in this case—for lawyers in Denver, Colorado, with extensive and specific experience—are unreasonable. The first two cases—*Center for Biological Diversity* and *Prison Legal News*—are dated and are clearly distinguishable from the facts here. *Rocky Mountain Wild* is a well-reasoned order, but the court's comments regarding the uncontested hourly rate of an attorney with 21 years of experience in Durango provide no real guidance.

I find the rates of $645 per hour for Mr. Kelley and $540 per hour for Mr. Fox are unquestionably reasonable, and I have no doubt clients in Denver would pay those rates for the services provided by both attorneys in this case. Likewise, $355, $300, and $320 per hour for Ms. Jordan, Ms. Gonzales, and Mr. Jimenez, respectively, are reasonable considering the level of work necessitated by Defendants' tactics.

I nevertheless agree with Defendants that the legal-assistant and paralegal rate should be reduced to $125 per hour. I recognize that other judges in this District have recently permitted greater rates for paralegals, *see, e.g.*, *Edwards v. Edwards*, No. 20-cv-02843-CMA-SKC, 2021 WL 130690, at *2 (D. Colo. Jan. 14, 2021), but Plaintiff has not persuaded me that such higher rates are justified here. The record contains no information on the various qualifications of the paralegals and legal assistants, and the billing invoices do not demonstrate that the work required specialized experience or knowledge.

**C. Reasonableness of the Lodestar Amount**

The lodestar amount is the number of hours reasonably expended by Plaintiff's counsel in substantially prevailing in this case multiplied by the hourly rates I have found to be reasonable, which amounts to $201,088.75.[8] Defendants argue that, even though Plaintiff accomplished some of its goals, "it certainly did not obtain complete success in this litigation, and its award of fees should be adjusted downward accordingly." Resp. at 20. They suggest a reduction of at least 10% of the full fee award. *Id.* (citing *Rosenfeld v. Dep't of Justice*, 904 F. Supp. 2d 988, 1007-08 (N.D. Cal 2012)). Plaintiff insists it was fully successful: It obtained the four categories of records that it prioritized highest and gained access to current information regarding the expansion of the Aurora facility. While the extent of Plaintiff's success is important in determining the proper amount of the attorney-fee award, *see Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983), I will not permit agencies to stall until records become mostly obsolete and then claim complainants are not entitled to their fees because they did not fully prevail, *see* Reply at

---

[8]To reach this total, I subtracted $5,000 from Plaintiff's fee request for the Motion for Sanctions and $1,235 for the decreased paralegal rate. I then reduced that amount by 15%.

19

15 ("To disallow fee recovery due to lack of success caused by ICE's dereliction of duty would enable ICE to complete its administrative repeal of FOIA."). Thus, I find it would be inappropriate to apply a reduction to the attorney-fee award based on Plaintiff agreeing to settle after obtaining only some of the requested records.

### III. Conclusion

I conclude the lodestar amount as calculated in this Order represents the fees reasonably incurred by Plaintiff's counsel in substantially prevailing in this litigation. Plaintiff's Motion for Award of Attorney Fees and Costs (ECF No. 80) is, therefore, GRANTED. Plaintiff is awarded its reasonably incurred attorney fees in the amount of $201,088.75 and its other litigation costs of $475. The parties are DIRECTED to file a joint statement or other document on or before September 17, 2021, regarding how the Plaintiff's claims in this case are to be resolved (e.g., dismissal) so that the case may be closed.

DATED this 7th day of September, 2021.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE